

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

ENTERED
04/29/2009

| | | |
|---|---|---|
| IN RE: | § | |
| **SHAWNA YOUNGBLOOD** | § | **CASE NO: 07-70072** |
| Debtor(s) | § | |
| | § | **CHAPTER 7** |
| | § | |
| **MONTE BRETT MARSHALL,** *et al* | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 07-07014** |
| | § | |
| **SHAWNA YOUNGBLOOD** | § | |
| Defendant(s) | § | |

## <u>MEMORANDUM OPINION</u>

### Background

On June 19, 2007, plaintiffs Monte Brett Marshall, James Curtis Herring (Independent Executor of the Estate of Rowena Sawyer), and the Estate of Rowena Sawyer ("Plaintiffs") filed an adversary proceeding against defendant Shawna Youngblood. Ms. Sawyer was Ms. Youngblood's grandmother. During an approximately six-month period, over $20,000.00 was transferred from Ms. Sawyer's bank account. During the same time period, a separate $20,000.00 certificate of deposit was transferred from an account and pledged as collateral for a vehicle purchased by Ms. Youngblood. After Ms. Youngblood defaulted on the payments, the bank used the CD to pay off the loan. Ms. Youngblood contends that all transfers were gifts from Ms. Sawyer intended to help Ms. Youngblood stabilize her life after a series of personal issues.

Plaintiffs allege that Ms. Youngblood defrauded her grandmother by forging Ms. Sawyer's name on checks and other financial documents. Plaintiffs assert the following causes of action: conversion, theft, common law fraud, and breach of fiduciary duty. Plaintiffs seek

1

actual damages in the amount of $48,285.91, exemplary damages, and attorneys' fees. Additionally, Plaintiffs seek a finding that any judgment issued against Ms. Youngblood is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

## Summary

The Court held a trial on July 22, 2008 and August 18, 2008.  Based on the evidence presented and for the reasons set forth below, the Court finds that Plaintiffs have not met their evidentiary burden with respect to most allegations.  After the evidentiary record is pared of discredited testimony,[1] there is little evidence to controvert Ms. Youngblood's testimony that the transfers were made with Ms. Sawyer's consent and based on Ms. Sawyer's undisputed desire to help her granddaughter meet her basic necessities.

However, the Court finds that Ms. Youngblood is liable for breach of a fiduciary duty for a portion of the withdrawals from Ms. Sawyer's accounts.  Ms. Youngblood owed Ms. Sawyer a fiduciary duty based on their close personal relationship.  Ms. Youngblood breached that duty by expending funds in an amount exceeding what was reasonably necessary for the support of herself, her daughters, and Ms. Sawyer.  However, the debt arising from the breach of fiduciary duty is *not* a non-dischargeable debt under 11 U.S.C. § 523(a)(4) because Ms. Youngblood's fiduciary duty did not arise from an express or technical trust as required by § 523(a)(4).

The Court also finds that Ms. Youngblood is liable for fraud for obtaining the $20,000.00 CD by a material misrepresentation.  This amount of the Court's judgment is excepted from discharge under § 523(a)(2).

---

[1] A substantial portion of the testimony given by Ms. Youngblood's mother (Darlene Holdridge) focused on whether certain signatures were actually the signatures of Ms. Sawyer.  Ms. Holdridge repeatedly testified as to which signatures she recognized and which were forged.  In several instances, the differences in signature were indiscernible.  On further questioning, Ms. Holdridge acknowledged that she could not tell which signatures were genuine.  Instead, she had testified that the signatures were forged because she had concluded that Ms. Sawyer would not have written checks for the purposes shown on the checks.  In reality, she was unable to discern which signatures were genuine and the entire, lengthy line of testimony was discredited.

## Jurisdiction and Venue

The Court has jurisdiction of this matter under 28 U.S.C. § 1334.  Venue is proper in this District pursuant to 28 U.S.C. § 1409.  This is a core proceeding under § 157(b)(2)(I).

## Conversion, Theft, Fraud

The Texas Civil Practice & Remedies Code authorizes civil causes of actions for conduct that constitutes a violation of the theft provisions of the Texas Penal Code. TEX. CIV. PRAC. & REM. CODE § 134.004 (Vernon's 2007). The Texas Penal Code does not have a conversion provision, but rather, a general "theft" chapter that incorporates the various methods of unlawful acquisition of property.  Section 134.003(a) provides that "[a] person who commits theft is liable for damages resulting from the theft." Section 134.002(2) defines "theft" as conduct constituting a violation of §§ 31.03, 31.04, 31.05, 31.06, 31.07, 31.11, 31.12, 31.13, or 31.14 of the Penal Code. Section 31.03(a)-(b)(1) defines theft as acquiring property of the another without the owner's effective consent and with the intent to deprive the true owner of that property.  The remaining Penal Code provisions incorporated by § 134.002(2) are inapplicable to this case.

"The elements of fraud are: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made the statement recklessly without any knowledge of the truth; (4) the speaker made the representation with the intent that the other party should act on it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Cooper v. Cochran*, --- S.W.3d ---, 2009 WL 944394 (Tex. App.—Dallas, Apr. 9, 2009, no pet. h.) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).

3

**Analysis**

Plaintiffs' seek damages based on four allegations: improper withdrawals from Ms. Sawyer's accounts; a vehicle purchased through false representations; stolen cattle, and unauthorized use of a debit card.  The Court considers the four allegations separately below.

**i. The Withdrawals**

To support their allegations with respect to alleged improper withdrawals, Plaintiffs submitted extensive documentary and testimonial evidence.  Plaintiffs submitted bank statements showing account balances and numerous checks.  Plaintiffs also offered the testimony of Darlene Holdridge, Ms. Youngblood's mother, and Linda James, a forensic document examiner.  The Court considers the evidence separately below.

**a. Ms. Sawyer's Bank Accounts**

Approximately $20,000.00[2] was withdrawn over an approximately 5-month period. Plaintiffs introduced abundant evidence that Ms. Sawyer's bank accounts were systematically depleted from May to November of 2002 through personal checks bearing Ms. Sawyer's signature.[3]  During May through June, Ms. Sawyer's Wells Fargo account balance went from $10,434.20 to $2,166.31.  From June to September, Ms. Sawyer's Texas Champion Bank account balance went from $4,748.16 to $409.31.  From September to October, Ms. Sawyer's First State Bank account balance went from to $2,353.20 to $3.57.  Numerous withdrawals were for large amounts of cash taken, sometimes taken the same day or only a day apart.  However,

---

[2]  The Court cannot precisely discern the amounts withdrawn from checks benefiting Ms. Youngblood.  The evidentiary record did not document all withdrawals from the accounts. Accordingly, the Court uses a $20,000.00 estimate based on bank statement balances and copies of checks admitted as evidence.

[3]  Ms. Youngblood testified that she stayed with Ms. Sawyer from July through October of 2002.  Ms. Holdridge suggested that Ms. Youngblood lived with Ms. Sawyer from May through October.

numerous withdrawals also appeared to have been used to cover reasonable and necessary living expenses for Ms. Sawyer, Ms. Youngblood, and Ms. Youngblood's daughters.

The Court documents the account activity below.

### 1. Wells Fargo Bank

Ms. Sawyer's May 6, 2002 balance was $10,434.20.  Ms. Sawyer's June 6 balance was $2,166.31.  By October 4, the account was overdrawn in the amount of $1,320.32.  By November 6, the account was overdrawn in the amount of $2,779.50.  Plaintiffs included copies of the following three withdrawals:

- ▪ May 22, for $3,158.00
- ▪ May 22, for $4,000.00
- ▪ June 26, for $839.31

The $4,000.00 withdrawal was signed by Ms. Sawyer.  The other two withdrawals were signed by Ms. Youngblood through power of attorney.  The Court has no evidence indicating the nature of other withdrawals.

### 2. Texas Champion Bank

Ms. Sawyer's June 25, 2002 Texas Champion Bank balance was $4,748.16.  Ms. Sawyer's September 25 balance was $409.31.  By October 27, Ms. Sawyer's account was overdrawn in the amount of $257.98.  By November 25, Ms. Sawyer's account was overdrawn in the amount of $375.98.

Many of the checks appeared to have been written for cash.  Between July 14 and August 22, checks in the amount of $2,870.00 were written to a bank or Ms. Youngblood.  Moreover, some large cash withdrawals were made only three days apart.

However, some checks appear to have been written for necessary living expenditures. Checks were written to grocery stores and a carpet cleaning service. Some checks written for cash were characterized as reasonable and necessary expenses. The "memo" line in a check written to Megan Wieding, Ms. Youngblood's daughter, stated that it was for "school shopping." Other "memo" lines indicated that the checks were written for repairs and Home Depot purchases. On July 21, 2002, a $195.00 check was written to the "Royal Inn" and characterized as "flood out assistance."[4]

### 3. Northwest Bank

The record does not include documents indicating account balances for a Northwest Account. The record includes the following checks written from the Northwest account for cash:

- ▪ May 22, for $800.00, to Wells Fargo

- ▪ June 2, for $1,300.00, to Wells Fargo

- ▪ August 18, for $200.00, to Ms. Youngblood

- ▪ August 18, for $380.00, to First National Bank.

- ▪ (date unidentifiable), for $265.00, to First National Bank

Some of the checks were described as expenditures for reasonable and necessary living expenditures. The $380.00, and $265.00 checks, in addition to another August 18 check for $200.00, were described as reimbursements to Ms. Youngblood for water-well repairs. Withdrawals also included checks written to a Farmer's Co-Op, a grocery store, and to unidentified individuals for establishing an unidentified escrow account. The $800.00 check was "for" a "vehicle exp. Loan." The $1,300.00 check was for a "tuition reimbursement."

---

[4] It is undisputed that the residence was flooded during a storm during the relevant period.

### 4. Nations Bank of Texas

On, September 18, a check for $1,293.18 was written to Wells Fargo from a Nations Bank of Texas account in Ms. Sawyer's name.  There is no evidence indicating how these funds were used.

### 5. First State Bank

Ms. Sawyer's September 30, 2002 First State Bank balance was $2,353.20.  Ms. Sawyer's October 31, 2002 balance was $3.57.  The November 30, 2002 ending balance was negative $4.43.  As with the other accounts, some checks were described as expenditures for ordinary living expenditures while others appear to have been cash withdrawals or questionable expenses.  A check in the amount of $625.00 was written to a grocery store.  A check in the amount of $70.00 was written to an unidentified individual, bearing Ms. Sawyer's signature.  A check in the amount of $64.94 was written to a Best Western.  Checks in the amount of $1,850.00 were written to a bank, Ms. Sawyer directly, or were direct withdraws, all, seemingly for cash.

Many checks were written only days apart, and, in one case, on the same day.  The checks were made on the following dates:

- October 8, $25.00, to Ms. Youngblood

- October 10, for $400.00, to First National Bank

- October 16, for $350.00, to First National Bank

- October 20, for $400.00, to First National Bank

- October 20, for $300.00, to Ms. Youngblood

- October 24, for $175.00, to Ms. Youngblood

- October 25, for $200.00, to First National Bank

The majority of these checks were described as "relocation expenses" for Ms. Youngblood's move to Houston.

### b. The Testimony

#### 1. Ms. Youngblood

Most withdrawals are not inconsistent with Ms. Youngblood's testimony that Ms. Sawyer voluntarily transferred funds to help her granddaughter reorganize her life. Ms. Youngblood testified that she became estranged from her family, other than Ms. Sawyer, after she divorced her first husband and married Mr. Youngblood. Ms. Youngblood contends that Ms. Sawyer was her lone ally within her family, and Plaintiffs are simply trying to undo Ms. Sawyer's generosity.

Ms. Youngblood testified that all disputed funds were given with Ms. Sawyer's approval and based on Ms. Sawyer's desire to help her granddaughter get back on her feet. Ms. Youngblood testified that, at the request of Ms. Sawyer, Ms. Youngblood and her two daughters moved in with Ms. Sawyer in June of 2002. Ms. Youngblood testified that a portion of the funds were used on Ms. Sawyer's home, including water-well repair and carpet replacement. Other funds were used for food, clothing, and other necessities. Ms. Youngblood also testified that Ms. Sawyer had given substantial sums to her siblings in the past. According to Ms. Youngblood, Ms. Sawyer's gifts to her were not inconsistent with Ms. Sawyer's treatment of her other grandchildren.

Ms. Youngblood's testimony is supported by wire transfers given to Ms. Youngblood that predate the alleged unauthorized withdrawals. At least $3,400.00 was wired to Ms. Youngblood before she returned home in 2002. The wires included the following amounts:

- August 23, 2001, for $500.00

- September 5, 2001, for $1,100.00

- ▪ September 22, 2001, for $500.00

- ▪ October 6, 2001, for $300.00

- ▪ October 31, 2001, for $757.00

- ▪ November 8, 2001, for $249.00

Ms. Holdridge, Plaintiffs' primary witness, does not contest that Ms. Sawyer voluntary transferred these funds to help Ms. Youngblood.

### 2. Ms. Holdridge

Plaintiffs contend that Ms. Youngblood has had a long history of taking advantage of her family members and the incident with Ms. Sawyer is but the latest and most severe.  Plaintiffs allege that Ms. Youngblood forged Ms. Sawyer's signature on checks and other documents to defraud Ms. Sawyer.  To support the allegations, Plaintiffs largely relied upon the testimony of two witnesses: Linda James and Ms. Holdridge.

Ms. Holdridge testified that Ms. Sawyer wanted to help Ms. Youngblood, but that any transfers made to Ms. Youngblood were either loans or unapproved withdrawals.   Ms. Holdridge's testimony largely focused on check signatures.  Ms. Holdridge was asked to identify which check signatures were signed by Ms. Sawyer, and which were forged by Ms. Youngblood. Ms. Holdridge purported to identify authentic and forged signatures.

The bulk of Ms. Holdridge's testimony was fully discredited.  After questioning by the Court, it became clear that Ms. Holdridge's identifications were based on her understanding of the relationship between Ms. Sawyer and Ms. Youngblood rather than the physical characteristics of any signature.  The checks she believed were authorized by Ms. Sawyer were identified as signed by Ms. Sawyer, and those that she believed were not authorized by Ms.

Sawyer, were identified as signed by Ms. Youngblood.  Additionally, any testimony regarding Ms. Sawyer's statements or conduct is inadmissible hearsay. FED. R. OF EVID. 801(c).

However, Ms. Youngblood's testimony regarding what Ms. Sawyer communicated to her is not hearsay.  The statements are admissible as an admission of a party-opponent. FED. R. OF EVID. 801(D)(2). Though Ms. Sawyer is deceased and not a party to this lawsuit, any admissions she made are attributed to her estate. FED. R. OF EVID. 801(d)(2); *Estate of Shafer v. Comm'r of Internal Revenue*, 749 F.2d 1216, 1220 (6th Cir. 1984) ("Since Arthur, through his estate, is a party to this action, his statements are a 'classic example of an admission.'") (quoting FED. R. EVID. 801(D)(2) advisory committee note). *See also Phillips v. Grady County Bd of County Comm'rs*, 92 Fed. Appx. 692, 696 (10th Cir. 2004) (quoting *Estate of Schafer*).

Ms. Holdridge also made admissions that support a finding that Ms. Sawyer authorized the disputed transactions.  Ms. Holdridge testified that after Ms. Sawyer suffered a stroke in 2002, her signature varied and she often had others help her write checks.  The disputed checks were all written after Ms. Sawyer's stroke.  Ms. Holdridge also admitted that Ms. Sawyer willingly gave Ms. Youngblood funds to help her grandchild stabilize her life.  Ms. Holdridge characterized the voluntary transfers as loans rather than gifts.  Ms. Holdridge also stated that the loans or gifts were given under conditions that Ms. Youngblood did not meet—namely, avoid drugs and Mr. Youngblood.  However, neither the existence of conditions nor a failure to comply with the conditions would support a finding of fraud, theft, or conversion.

### 3. Ms. James

Ms. James is a certified, published forensic expert with significant experience serving as an expert witness in civil and criminal cases.  Ms. James compared "known" signatures of Ms. Sawyer and Ms. Youngblood to the signatures on the disputed checks.  "Known" signatures were

signatures pre-dating the disputed transactions and taken from documents whose authenticity was not contested.  Ms. James attempted to identify "characteristics" unique to the known signatures and then examined the disputed signatures for the same "characteristics."  Based on the number and quality of "characteristics" found in the disputed signatures, Ms. James classified the disputed signature along a classification scheme that varied based on the probability of the forgery.

On cross-examination, Ms. James made several important admissions.  She admitted that she examined only copies rather than original documents.  She admitted that analyzing  originals is preferred and more accurate.  Ms. James also admitted that the "known" signatures and all other documents were provided solely by Plaintiffs' attorney.  Ms. James admitted that she had not examined the disputed power of attorney document.  Most importantly, Ms. James admitted that she was not told Ms. Sawyer's age or that she had suffered a stroke.  Ms. Holdridge testified that Ms. Sawyer had suffered a stroke in April of 2002, just before the disputed transactions.  Ms. Holdridge also testified that Ms. Sawyer had someone else write her checks after suffering the stroke.  Ms. James admitted that health conditions could affect a signature.  All the "known" signatures of Ms. Sawyer given to Ms. James predated Ms. Sawyer's stroke.

The Court need not make a determination of Ms. James's credibility or the reliability of her findings.  Assuming the Court accepted Ms. James opinion as true, a crucial question remains unanswered: did Ms. Sawyer give Ms. Youngblood the authority to sign her name to the checks?  Ms. Holdridge admitted that Ms. Sawyer often had someone else write her checks after she suffered her stroke.  The disputed checks were all written after Ms. Sawyer suffered the stroke.  Ms. Holdridge admitted that Ms. Sawyer wanted to help Ms. Youngblood and voluntarily gave her significant funds.  Accordingly, even if Ms. Youngblood signed Ms. Sawyer's name to the

checks, Plaintiffs have offered no significant evidence that Ms. Sawyer did not authorize the signature or that otherwise disputes Ms. Youngblood's testimony that Ms. Sawyer authorized all the disputed transactions.

### 4. Mr. Marshall

Brett Marshall, Ms. Youngblood's brother, testified that he investigated the home soon after Ms. Youngblood left.  Mr. Marshall testified that any alleged repairs were unnecessary, incomplete, or inconsequential.  Specifically, he testified that the alleged repairs consisted of the following: interior painting, gluing wallpaper and plywood onto brick walls and a fireplace, removal of a sink and bathtub, and partially re-carpeting a guestroom with "scrap" carpeting. Ms. Youngblood offered no receipts or other evidence with respect to the repairs.  Based on the evidence, the Court finds that only an insignificant amount of the disputed funds were used for repairs.

### c. Summary

After consideration of all the documentary and testimonial evidence with respect to withdrawals from Ms. Sawyer's accounts, the Court is left only with the following facts:

▪ approximately $20,000.00 was withdrawn from Ms. Sawyer's accounts during the months of May through October for the benefit of Ms. Youngblood, Ms. Youngblood's two daughters, and Ms. Sawyer.

▪ Ms. Sawyer wanted to help Ms. Youngblood and Ms. Youngblood's daughters and voluntarily gave Ms. Youngblood thousands of dollars to this effect.[5]

Additionally, the Court has the following disputed evidence:

▪ Ms. Youngblood's testimony that all transfers were approved by Ms. Sawyer.

▪ Ms. James and Ms. Holdridge's testimony that signatures on the checks varied.

---

[5] Whether the transfers were given with conditions or characterized as loans is inconsequential to Plaintiffs' causes of action.

Given the paucity of evidence related to Ms. Sawyer's intent, the Court finds that Plaintiffs have failed to meet their evidentiary burden with respect to the fraud, theft, and conversion claims. No one disputes that Ms. Sawyer wanted to help Ms. Youngblood and Ms. Youngblood's daughters. No one disputes that Ms. Sawyer gave Ms. Youngblood significant sums to assist them. The only admissible testimony with respect to Ms. Sawyer's intent came from Ms. Youngblood. Though the Court did not find Ms. Youngblood's testimony highly credible, neither did the Court find it incredible. There is insufficient evidence to rebut Ms. Youngblood's testimony that the transfers were authorized by Ms. Sawyer.

### ii. Vehicle Loan

Ms. Youngblood took a $22,000.00 loan from Wells Fargo to purchase a 2002 Ford Explorer. A $20,000.00 CD drawn from Ms. Sawyer's funds secured the loan. The loan was taken in both Ms. Youngblood and Ms. Sawyer's names, and direct payments were to be drawn from one of Ms. Sawyer's accounts. Wells Fargo employees testified that they never saw Ms. Sawyer and that all documents were signed by Ms. Youngblood based on a power of attorney purporting to grant Ms. Youngblood a durable power of attorney for Ms. Sawyer. The $20,000.00 CD was ultimately taken by Wells Fargo to pay the loan balance after Ms. Youngblood defaulted on the loan. In December of 2002, Ms. Youngblood sold the vehicle for $16,000.00. Ms. Youngblood contends that the proceeds were used to pay for legal expenses incurred in defense of criminal charges brought by Plaintiffs.

Plaintiffs raised significant questions as to the authenticity of the power of attorney document. The document was dated November 23, 2000, notarized by Diane Murphy, and stated that it was executed in Live Oak County. Diane Giesler, formerly Diane Murphy, testified through written answers to interrogatory questions that she stopped using the name Diane

Murphy in 1979.  Ms. Giesler also testified that she stopped serving as a notary in 1988.  Mildred James, the Live Oak County Clerk from 1982 through 2002 testified through written answers to interrogatory questions that the power of attorney agreement was not on file in Live Oak County, and that the Live Oak County's clerk office generally includes on recorded documents information, stamps, and seals that were not included on Ms. Youngblood's power of attorney document.  Ms. Youngblood offered no testimony with respect to the power of attorney agreement.  Based on the testimony of Ms. Giesler and James, the Court finds that the power of attorney agreement was a forged document.

Ms. Youngblood alleged that she discussed the vehicle purchase with Ms. Holdridge and Ms. Sawyer and both approved the transaction.  Ms. Holdridge testified that Ms. Youngblood misrepresented the purpose of the CD.  Ms. Holdridge testified that Ms. Youngblood represented that the vehicle would serve as collateral for the loan. The Court accepts Ms. Holdridge's testimony and rejects Ms. Youngblood's testimony based on its finding that the power of attorney document was forged.  The Court can afford little credibility to Ms. Youngblood's testimony with respect to the vehicle transaction given that Ms. Youngblood forged a legal document to complete the transaction.

Accordingly, the Court finds that Ms. Youngblood committed fraud with respect to the $20,000.00 CD.  Ms. Youngblood obtained the $20,000.00 CD through a forged document and also made material, known false representations regarding the purpose of the CD.   Ms. Youngblood made the representation with the intent to improperly use the CD for her benefit.  Ms. Sawyer relied on that false representation and suffered a loss of $20,000.00 as a result.

### iii. Use of Debit Card

Plaintiffs' allegations that Ms. Youngblood used plaintiff Marshall's debit card without his permission is insufficiently supported by the evidentiary record.  Plaintiffs offered no evidence to support the accusations related to Mr. Marshall's debit card other than unsupported testimony repeating the allegation.  Mr. Marshall's claim is dismissed.

### iv. Theft of Cattle

Plaintiffs' allegation that Ms. Youngblood conspired with others to steal cattle is also insufficiently supported by the evidentiary record.  Ms. Holdridge testified that cattle were stolen, but did not offer any testimony that would support a finding that Ms. Youngblood was involved in the theft.  Plaintiffs' only evidence was a written response to a deposition question from Glen Thompson, a deputy with the Live Oak County Sheriff's department that investigated criminal complaints filed by Plaintiffs against Ms. Youngblood.  In the written response, Mr. Thompson states that Ms. Youngblood admitted that Mr. Youngblood had stolen the cattle and that he had given her some of the proceeds from the theft.  A single hearsay statement, though admissible as an admission, made in writing in response to a written question and unsupported by additional questions that would provide context for the alleged admission is insufficient to support the theft allegation.  Additionally, all criminal complaints were dismissed.   There is inadequate evidence to find that Ms. Youngblood participated in the theft or had knowledge of the theft.

### v. Breach of Fiduciary Duty

Authorized transactions cannot give rise to a fraud, theft, or conversion claim, but may give rise to a breach of fiduciary duty claim.

Under Texas law, a fiduciary duty can arise from formal legal relationships like an attorney-client relationship, or an informal relationship of confidence. *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002); *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)). An informal fiduciary duty "arises from a 'moral, social, domestic, or purely personal relationship of trust and confidence.'" *Id.* (quoting *Associated Indem. Corp.*, 964 S.W.2d at 287). "[T]he law recognizes the existence of confidential relationships in those cases 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *Associated Indem. Corp.*, 964 S.W.2d at 287 (quoting *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)). "In resolving the problem of the existence or not of a fiduciary relationship this Court has severely scrutinized transactions between parties when trust and confidence is reposed by one, and personal profit is gained by another." *Texas Bank & Trust Co.*, 595 S.W.2d at 508. "The problem is one of equity and the circumstances out of which a fiduciary relationship will be said to arise are not subject to hard and fast lines."

The Court finds that Ms. Youngblood owed a fiduciary duty to Ms. Sawyer based on an informal relationship of confidence.  Ms. Sawyer invited Ms. Youngblood into her home and entrusted her with check-writing.  Ms. Sawyer was also Ms. Youngblood's grandmother and was made vulnerable by her age and stroke.  Texas state courts have imposed a fiduciary duty within relationships of confidence similar to the relationship between Ms. Sawyer and Ms. Youngblood. In *Hatton v. Turner*, a Texas Court of Appeals found:

> The record in this case amply evidences a confidential relationship.  Among several factors which indicate a confidential relationship are kinship, advanced age and poor health, taken together with evidence of trust. Bogert, Trusts & Trustees, s 482 (rev. 2nd ed. 1978). The record here clearly shows the family kinship as parent-child and brother-sister and the status of the father's age and health.  It is also clear as to the confidence and trust which the father confided in his son, Lee Hatton, and as to the confidence and

reliance the appellees placed in their brother that he would fulfill his assurances that he was holding the property in question for the benefit of the appellees as heirs to their parents' estate.

622 S.W.2d 450, 458–59 (Tex. App.—Tyler 1981, no writ)

A fiduciary owes a duty to manage any funds entrusted to the fiduciary with utmost honesty and for the principal's best interest.  "A fiduciary has no right to make merchandise of the confidence reposed in him." *Hendricks v. Wall*., 277 S.W. 207, 209 (Tex. Civ. App. 1925). A fiduciary "owes his principal loyalty and good faith; integrity of the strictest kind; fair, honest dealing; and the duty not to conceal matters which might influence his actions to his principal's prejudice." *Douglas v. Aztec Petroleum Corp.*, 695 S.W.2d 312, 318 (Tex. App.—Tyler 1985, no writ) (citing *Anderson v. Griffith*, 501 S.W.2d 695 (Tex. Civ. App.—Houston [1st Dist.] 1974, write ref'd n.r.e.)). "Stated another way, a party fails to comply with his fiduciary duty 'where influence has been acquired and abused, and confidence has been reposed and betrayed.'" *Lee v. Hasson*, ---S.W.3d ---, 2007 WL 236899 (Tex. App.—Houston [14th Dist.] Jan. 30, 2007, pet. denied) (quoting *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14 Dist] 1998, pet. denied)).

Over $20,000.00 was withdrawn from Ms. Sawyer's accounts over approximately five months.   The Court accepts Ms. Youngblood's testimony that Ms. Sawyer wanted to help her and that she authorized many withdrawals to support her grandchild and two great grandchildren. Many withdrawals appear to have been for reasonable and necessary living expenses that were consistent with Ms. Sawyer's intent and Ms. Youngblood's fiduciary duty.  However, there is little documentation evidencing how the withdrawals were spent.  Without such evidence, the Court cannot identify which withdrawals were consistent with Ms. Youngblood's fiduciary duty. As the fiduciary and the only party who would have possession of such documentation, the Court

17

places the burden of justifying the withdrawals on Ms. Youngblood.  Ms. Youngblood has not

met this burden.

Based on the totality of the evidence, the Court finds that not more than $2,000.00 per

month should be allocated to reasonable living expenses.  Accordingly, the Court finds that Ms.

Youngblood is liable for the excess of $10,000.00.

Although a judgment is awarded for the purposes of completeness, the judgment is

simultaneously discharged for the reasons set forth below.

### Dischargeability

**i. Section 523(a)(2)(A)**

Section 523(a)(2)(A) excepts from discharge debts "for money, property, services, or an

extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false

representation, or actual fraud, other than a statement respecting the debtor's or an insider's

financial condition." 11 U.S.C. § 523(a)(2)(A).  Fraud under § 523(a)(2)(A) is essentially the

same as fraud under Texas state law. *See In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001). As

discussed above, Ms. Youngblood committed fraud with respect to the $20,000.00 CD.  The

Court finds that this $20,000.00 debt is non-dischargeable under § 523(a)(2)(A).

**ii Section 523(a)(4)**

The Sawyer Estate alleges that Ms. Youngblood's debt should be found non-

dischargeable pursuant to § 523(a)(4).  That section excepts from discharge any debt "for fraud

or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  Fraud under

§ 523(a)(4) involves "intentional deceit, rather than implied or constructive fraud." *In re Swor*,

2008 WL 938940 *5 (Bankr. S.D. Tex. Apr. 4, 2008); *In re Tripp*, 189 B.R. 29 (Bankr. N.D.

N.Y. 1995); *In re McDaniel*, 181 B.R. 883 (Bankr. S.D. Tex. 1994); COLLIER ON BANKRUPTCY,

¶ 523.10[1][a]. "A defalcation is a willful neglect of duty, even if not accompanied by fraud or embezzlement." *In re Bennett*, 989 F.2d 779, 790 (5th Cir. 1993) (citing *Moreno v. Ashworth*, 892 F.2d 417, 421 (5th Cir. 1990)). Willful neglect is "essentially a recklessness standard." *In re Felt*, 255 F.3d 220, 226 (5th Cir. 2001) (quoting *Schwager v. Fallas*, 121 F.3d 177, 185 (5th Cir. 1997)). "Thus, willfulness is measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known." *Id.*

Though the Court finds that Ms. Youngblood breached a fiduciary duty under Texas Law, § 523's definition of fiduciary is more limited than the state law concept of a fiduciary. The definition of "fiduciary" under § 523(a)(4) is "controlled by federal common law rather than Texas law." *Miller v. J.D. Abrams Inc. (In re Miller)*,156 F.3d 598,  602 (5th Cir. 1998). Under § 523(a)(4) "a fiduciary is limited to instances involving express or technical trusts." *Id.* (quoting *Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998)). A constructive trust is not sufficient to create a fiduciary relationship.  *See Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1339 (5th Cir. 1980). Additionally, the trustee's duties must "arise independent of any contractual obligation". *In re Tran*, 151 F.3d at 342 (citing *Angelle*, 610 F.2d at 1339). The trustee's obligations "must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong." *Id.* (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)); *Angelle*, 610 F.2d at 1339 (A technical trust must "exist prior to the act creating the debt and without reference to that act.").

The Fifth Circuit recognizes that the "'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law." *LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 784-85 (5th Cir. 1993) (citing *Moreno v. Ashworth*, 892

F.2d 417, 421 (5th Cir. 1990)). State law, therefore, "is important in determining whether or not a trust obligation exists." *Gupta v. E. Idaho Tumor Inst. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004) (quoting *LSP Inv. P'ship*, 989 F.2d at 784). "The state may impose trust-like obligations on those entering into certain kinds of contracts, and these obligations may make a contracting party a trustee." *In re Angelle*, 610 F.2d at 1341.

Under Texas law, a fiduciary duty arising from a confidential relationship gives rise to a constructive trust, but not an express or technical trust.

The Texas Supreme Court has stated:

> While a confidential or fiduciary relationship does not of itself give rise to the constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust . . .

*Fitz-Gerald v. Hull*, 237 S.W.2d, 256 261 (1951) (quoting Sec. 225, 54 AM. JUR., "Trusts," p. 173). This Court recently issued a Memorandum Opinion holding that a fiduciary obligation that did not arise from an express or technical trust was insufficient to support a § 523(a)(4) discharge exception. *In re Holdaway*, 388 B.R. 767 (Bankr. S.D. Tex. 2008). On appeal, the District Court affirmed this Court's *Holdaway* opinion. *In re Holdaway*, 2009 WL 820167 (Bankr. S.D. Tex. March 26, 2009)).

Ms. Youngblood's fiduciary duty arose from an informal confidential relationship rather than a formal fiduciary obligation. Accordingly, Ms. Youngblood's fiduciary duty was not the type of fiduciary duty recognized by § 523(a)(4). The Court denies Plaintiffs' § 523(a)(4) discharge exception as to the $10,000.00 in unreasonable withdrawals.

### Remedies

#### i. Constructive Trust

Plaintiffs' initial complaint asked the Court to charge the judgment against various real property interests Ms. Youngblood inherited from Ms. Sawyer.  The complaint offered no legal authority authorizing such a remedy.  Plaintiffs' subsequent Preliminary Proposed Findings of Fact and Conclusions of Law and Post Trial Brief do not re-urge the constructive trust remedy. Constructive trusts are generally imposed on property obtained by inequitable conduct. *Pope v. Garrett*, 211 S.W.2d 559, 560 (Tex. 1948) ("The case is a typical one for the intervention of equity to prevent a wrongdoer, who by his fraudulent or otherwise wrongful act has acquired title to property, from retaining and enjoying the beneficial interest therein, by impressing a constructive trust on the property in favor of the one who is truly and equitably entitled to the same.")  There is no evidence that Ms. Youngblood acquired her inheritance interest by actual or constructive fraud.  Accordingly, the Court will not charge any judgment against Ms. Youngblood's inheritance interests.

#### ii. Attorneys' Fees, Exemplary Damages, and Pre-Judgment Interest

The Court denies Plaintiffs' request for attorneys' fees, exemplary damages, and pre-judgment interest.

Plaintiffs seek attorneys' fees pursuant to § 134.005(b) of the Texas Civil Practices and Remedies Code, and § 24.013 of the Texas Business and Commercial Code.  Section 134.005(b) only applies to parties who are successful on theft claims. TEX. CIV. PRAC. & REM. CODE § 134.005(b).  Plaintiffs have not succeeded on their theft claim.  Section 24.013 only applies to claims brought under the Texas Fraudulent Transfer chapter. TEX. BUS. & COM. CODE § 24.013.

Plaintiffs assert no claims under the fraudulent transfer chapter of the Texas Business and Commercial Code.

Plaintiffs seek exemplary damages pursuant to § 41.003 of the Texas Civil Practices and Remedies Code. Section 41.003 authorizes exemplary damages for injuries caused by fraud, malice, or certain wrongful death actions. TEX. CIV. PRAC. & REM. CODE § 41.003. Though Plaintiffs have succeeded on their fraud claim with respect to the $20,000.00 CD, the Court declines to award exemplary damages.

The determination of whether to award exemplary damages is within the trier of fact's discretion. TEX. CIV. PRAC. & REM. CODE § 41.010(b). Section 41.011(a) lists six factors the trier of fact must consider: the nature of the wrong; the character of the conduct involved; the degree of culpability of the wrongdoer; the situation and sensibilities of the parties concerned; the extent to which such conduct offends a public sense of justice and propriety; and the net worth of the defendant. *Id*. at § 41.011(a).

Few of the six factors are implicated in this case. Ms. Youngblood does not have substantial assets. The fraud was of a relatively minor amount. Ms. Sawyer, though elderly and a victim of stroke, did not have any mental deficiencies. The Court also notes that elements of the vehicle transaction were known by Ms. Sawyer. Ms. Youngblood's conduct is offensive, but so is any conduct that gives rise to intentional tort liability. Exemplary damages are not attached to all judgments, but are reserved for conduct that exceeds the norm. With respect to exemplary damages, the question is not whether the conduct is offensive, but whether the conduct is more offensive than the baseline offensive act. There is nothing in the evidentiary record that would justify characterizing Ms. Youngblood's fraud as of the kind that warrants exemplary damages. The "primary purpose of exemplary damages [is] to punish and deter." *Fairfield Ins. Co. v.*

22

*Stephens Martin Paving, LP*, 246 S.W.3d 653, 666 (Tex. 2008).   Based on the facts and circumstances of this case, the Court finds that judgment in the amount of actual damages is sufficient to punish and deter Ms. Youngblood.

**Conclusion**

For the reasons set forth above, the Court awards judgment to the Estate of Ms. Sawyer in the amount of $30,000.00.   Of this amount, $20,000.00 is non-dischargeable and the balance is discharged.   Post-judgment interest accrues at 0.52%.   A separate judgment will be issued.

SIGNED **April 29, 2009.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE